## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J.R., a minor, by his parents and next friends,
B.R. and N.R.,

and

B.R. and N.R.,

       Plaintiffs,

       v.

LARRY BOWERS (officially as),  Superintendent,
Montgomery County Public Schools,
850 Hungerford Drive,
Rockville, Maryland 20850,

and

MONTGOMERY COUNTY BOARD OF
EDUCATION,
850 Hungerford Drive,
Rockville, Maryland 20850,

       Defendants.

Civil Action No. 16-01633

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.     This is an action brought by B.R. and N.R. ("the parents"), in their own right and on behalf of their son, J.R., alleging that Montgomery County Public Schools ("MCPS"), failed to provide J.R. with the Free Appropriate Public Education ("FAPE") to which he is entitled under the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  In addition, the Administrative Law Judge ("ALJ") in this action compounded

the violation when she failed to find that MCPS engaged in predetermination of J.R.'s educational placement, erroneously determined that J.R.'s behavior is not the critical factor preventing his educational progress, and failed to hold MCPS responsible for its numerous discovery violations during the administrative appeal. Accordingly, the ALJ denied the parents their requested relief of funding and placement in the Multiple Learning Needs Program at the Ivymount School ("Ivymount"), in Rockville, Maryland. For any of these errors, the Court should reverse the ALJ's decision.

## Jurisdiction

2.      This Court has jurisdiction pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; 42 U.S.C. § 1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. This Court has pendent jurisdiction pursuant to MD. CODE ANN. EDUC. § 8-413. Plaintiffs have exhausted their administrative remedies and appeal from a decision of an Administrative Law Judge of the Maryland Office of Administrative Hearings, MSDE-MONT-OT-15-28847 (February 11, 2016).

## Parties

3.      J.R. is a sixteen-year-old educationally disabled student, eligible to receive accommodations and special education services under the IDEA. At all times relevant to this action, he resided in Montgomery County, Maryland. His parents B.R. and N.R. bring this action on J.R.'s behalf and in their own right.

4.      Larry Bowers is the Superintendent of the Montgomery County Public Schools ("MCPS" or "the school system"), and as such, is the public official charged with the responsibility for ensuring that MCPS complies with federal law as to the education of disabled children.  He is sued in his official capacity.

5.      The Montgomery County Board of Education receives financial assistance from the United States Department of Education.  The Montgomery County Board of Education is responsible for complying with federal law with respect to the provision of a FAPE to each disabled child in Montgomery County under the IDEA.

## Factual Allegations

6.      J.R. is a sixteen-year old student in the ninth grade in the Multiple Learning Needs Program at the Ivymount School ("Ivymount").

7.      Previously, J.R. attended High Road Academy ("High Road"), a private separate day school specializing in teaching students with specific learning disabilities, pursuant to an Individualized Education Program ("IEP") and placement provided by Montgomery County Public Schools ("MCPS" or " school system").

8.      J.R. has a long history of behavioral, emotional, and academic difficulties and qualifies for special education services as a student with Multiple Disabilities, specifically an Intellectual Disability, a Hearing Impairment, and an Other Health Impairment.  An Other Health Impairment means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment that is due to chronic or acute health problems.

9.     J.R. is a very complex child with a rare genetic disorder called KBG Syndrome ("KBG"), which is characterized by intellectual disability and skeletal malformations; KBG adversely affects growth, behavior, and hearing.

10.    KBG syndrome is so rare that there are only sixty known cases in the world; it evaded detection at Children's National Medical Center and a number of other nationally renowned institutions until J.R. participated in the National Institute of Health's Undiagnosed Disease Program ("UDP").

11.    Due to his disabilities, J.R. has been enrolled in many schools since beginning formal education.

12.    J.R. began preschool at Berman Hebrew Academy and then was transitioned to its Sulam program, a parochial program for students with special education needs.

13.    During the 2005-2006 school year, J.R. attended Kindergarten and began receiving services from MCPS at Beverly Farms Elementary School, where the school system determined his eligibility for special education as a student with an Other Health Impairment.

14.    For the 2006-2007 school year, J.R. repeated Kindergarten at Beverly Farms but was transitioned by MCPS into the school's Learning and Academic Disabilities program for students with significant learning challenges.

15.    For first grade during the 2007-2008 school year, J.R. initially attended Beverly Farms Elementary School but was later transferred to the Emotional Disabilities ("ED") Program at Westbrook Elementary School after his disability coding was changed to Emotional Disability.

16.    The ED Program at Westbrook proved ineffective at handling J.R.'s behaviors and, in 2010, MCPS held a Central IEP meeting ("CIEP") to consider alternative placements.

17.     Among the schools the CIEP team considered in 2010 were the Lourie School ("Lourie"), the Katherine Thomas School ("KTS"), and the Frost School ("Frost"), a non-public therapeutic full-time special education school.

18.     After receiving acceptances from Frost and Lourie, the CIEP team agreed on Frost for J.R.'s placement.  J.R. was not accepted by KTS due to behavioral concerns.

19.     In January 2010, J.R. transitioned to Frost with a one-to-one aide.

20.     By March of 2010, the parents raised concerns that Frost was not capable of meeting J.R.'s academic needs because his academic skills fell far below grade level.

21.     A new CIEP meeting was convened in April 2010 to discuss J.R.'s placement at Frost.

22.     At this meeting, the CIEP team, including the parents, their educational advocate, and George Moore, the MCPS CIEP placement chairman, discussed J.R.'s placement at Frost.

23.     The parents and their educational advocate proposed that J.R. attend Accotink, a small special education school in Virginia, but Mr. Moore rejected this proposal.

24.     Mr. Moore then unilaterally decided that J.R. needed to leave Frost and determined that he would transfer to the Foundation School ("Foundation") without seeking input from anyone else on the CIEP team or seeking consensus from the team.

25.     Foundation is a non-public special education institution primarily for middle and high school students with severe behavioral issues.

26.     When the parents protested that they knew nothing of Foundation, that J.R. had never been interviewed there, and that they were worried about the appropriateness of the

placement, Mr. Moore nonetheless declared that in thirty days the bus would pick up J.R. from home and take him to Foundation because this was his new placement.

27.    After the CIEP meeting, the parents visited Foundation to see what the placement would be like for J.R.

28.    The parents learned that Foundation would be very inappropriate for J.R., in part because J.R. would be the only student in the elementary school.

29.    The parents also felt that the severity of the behavioral issues of the middle and high school students at Foundation would present many issues for J.R.

30.    In May 2010, Dr. Ira Dosovitz, J.R.'s psychiatrist, wrote a letter to MCPS detailing his concerns about the proposed transfer to Foundation.

31.    Despite the parents' concerns and Dr. Dosovitz's letter, Mr. Moore refused to reconsider his placement determination, but eventually, a settlement with MCPS was reached keeping J.R. at Frost.

32.    Mr. Moore was not involved in the settlement discussion with the parents resulting in J.R. remaining at Frost.

33.    J.R. stayed at Frost for the remainder of the 2010-2011 school year and for the following fifth grade year.

34.    J.R.'s behavior improved during this latter time at Frost, but his academics did not.

35.    In the Fall of 2012, MCPS and the parents again reconsidered Frost's appropriateness for J.R.

36.    A CIEP meeting was held and J.R.'s file was referred by MCPS to Ivymount, KTS, and High Road.

37.    High Road is a non-public special education school for students with learning disabilities in reading and math.

38.    Since Ivymount did not have space in its program, J.R.'s application was not fully processed.

39.    KTS rejected J.R. again.

40.    High Road accepted J.R. and MCPS placed him there as of the end of the 2012-2013 school year.

41.    J.R. remained at High Road through eighth grade, the end of the 2014-2015 school year.

42.    At High Road, J.R. received specialized instruction throughout the day, four hours of speech and language services monthly, two hours of Occupational Therapy monthly, four hours of counseling services monthly, reading support and a one-to-one dedicated aide.

43.    J.R. continued to display worrisome behaviors at High Road, including non-compliance, vocal outbursts, and inappropriate physical contact with students and staff.

44.    J.R. did not significantly improve his math, reading, writing, or other academics while at High Road.

45.    During the Fall of 2014, the parents continued to consult with experts concerning the appropriate educational environment for J.R.

46.    N.R., J.R., and Dr. Dosovitz traveled to Boston to seek the advice of a specialist, Dr. Joseph Biederman, who recommended considering a switch from the diploma track to the certificate track.

47.    At an annual meeting to review J.R.'s IEP on December 23, 2014, the MCPS team acknowledged his lack of progress in several areas and discussed a possible switch from the diploma to certificate track.

48.    In the area of speech and language, J.R. had not mastered any goals or objectives and his speech and language provider continued to recommend services.

49.    J.R. was also found not to have made any progress on the social/emotional goals of his IEP.

50.    J.R.'s counselor, Michael Shorter, reported that he had not mastered any goals and was not making progress: "[J.R.] continues to need assistance whenever he leaves the classroom for any reason.  He is easily distracted, prone to engage in negative peer pressure, and lacks general focus to independently leave the classroom."

51.    Mr. Shorter also explained that, "[J.R.] will often shut down to the point where he will disregard any redirection from staff."   Mr. Shorter emphasized the continued need for a one-to-one aide and warned that without the aide, J.R. would regress.

52.    The IEP team decided that additional evaluations were needed before a determination could be made to switch J.R. to certificate track.

53.    However, no evaluations were ordered at the December 2014 meeting at High Road.

54.    Despite the intensive nature of the High Road full-time special education setting, the IEP team agreed that J.R. might need an even more intensive academic and behavioral program.

55.    J.R.'s case manager at MCPS, Brenda Aswall, was at the December 2014 IEP meeting and promised to guide the family to an appropriate placement, assuring them that the evaluation and placement discussion would be completed with enough time to start J.R. at a new school for the 2015-2016 school year.

56.    Ms. Aswall had worked with the parents for years and they had grown to trust her and rely on her word.

57.    After the December 2014 meeting, Ms. Aswall specifically urged the parents to consider alternative non-public schools, such as KTS.

58.    In an email chain from January 2015, N.R. wrote to Ms. Aswall, "I did speak with Marjorie Thiel [*sic*] at Katherine Thomas and that sounds too high functioning for [J.R.] but I am open to consider it."  Ms. Aswall replied, "I am glad to hear that you are checking out schools. Go and look at KTS.  Make sure you ask about the special program in the high school."

59.    In response to Ms. Aswall's recommendations that the parents should "get the ball rolling" with Ivymount, the parents started the application process with Ivymount.

60.    Throughout the Spring of 2015, the parents and Ms. Aswall discussed the strengths and weaknesses of both KTS and Ivymount, and the parents trusted her expert recommendation to consider both programs.

61.     Ms. Aswall never suggested that a public option was appropriate.  At no point prior to June 9, 2015 was the Rock Terrace School ("Rock Terrace"), a separate public day school, ever mentioned by Ms. Aswall or anyone else on J.R. IEP team as a potential placement

62.     In March 2015, a re-evaluation planning meeting was held and MCPS decided to conduct updated assessments in preparation for sending J.R.'s file to the Central Office for a placement referral to one of the non-public schools.

63.     MCPS selected Dr. Deitra Reiser to conduct a psychological assessment on J.R., and N.R. kept in touch with Dr. Reiser during the evaluation process.

64.     In accordance with Ms. Aswall's recommendation, J.R.'s parents started the application process with Ivymount.

65.     Dr. Reiser completed her report on June 3, 2015, concluding that J.R. is Intellectually Disabled.

66.     Dr. Reiser only conducted one cognitive assessment of J.R., the Kaufman Assessment Battery for Children - Second Edition.

67.     Dr. Reiser wrote that, "[J.R.] does not rely [*sic*] nor does he appear to require the services of a dedicated para-educator . . . School staff are encouraged to write and implement a short-term fading plan."

68.     Dr. Reiser's assessment was to be discussed at a CIEP meeting scheduled for June 9, 2015.

69.     The day before the June 2015 CIEP meeting, N.R. met with a friend who works as a reading specialist for MCPS.

70.    This friend explained that Mr. Moore takes control of CIEP meetings and warned N.R. that he might place J.R. at Rock Terrace.

71.    Rock Terrace is located next to the MCPS central offices where CIEP meetings are held; shortly before the scheduled IEP meeting, N.R. took a brief tour of Rock Terrace.

72.    N.R. was concerned by the large number of students in each classroom and the teaching methods at Rock Terrace.

73.    The CIEP meeting took place as scheduled on June 9, 2015, chaired by Mr. Moore.

74.    After Dr. Reiser's report was discussed, the parents expressed their opposition to the removal of the one-to-one aide before J.R. started a new school; the CIEP team agreed not to remove the one-to-one aide.

75.    The IEP team also agreed to place J.R. on the certificate track.

76.    In view of his significant needs, the CIEP team agreed that J.R.'s files should be sent to both KTS and Ivymount for possible placement.

77.    Mr. Moore urged the parents to also consider Rock Terrace as a fall back option.

78.    The parents left the meeting with the clear understanding that they were to visit all three schools and report to the committee which school they believed was the appropriate placement.

79.    Immediately following the meeting, MCPS sent out referral packets to Ivymount and KTS writing, "Montgomery County Public Schools is considering placement for [J.R.] in your program."

80.    Over the next month, J.R.'s parents and Dr. Dosovitz visited all three programs. They all agreed the appropriate fit for J.R. was Ivymount because of the three schools, Ivymount was the only one that would be able to address J.R.'s complex and significant behavioral and cognitive issues.

81.    Chief among the reasons that Ivymount was deemed appropriate for J.R. is its expertise in data collection and Adaptive Behavioral Analysis, a critical element for J.R.'s educational placement.

82.    J.R. was accepted to both KTS and Ivymount.

83.    On August 3, 2015,  N.R. emailed Ms. Aswall to relay J.R.'s acceptance and their decision that Ivymount was the correct placement.

84.    On August 6, 2015, Ms. Aswall had a phone call with N.R. during which she assured N.R. that, at the upcoming meeting, J.R. would be placed at Ivymount.

85.    The CIEP meeting was scheduled for August 7, 2015.

86.    On the morning of the CIEP meeting, Ms. Aswall called N.R. "off the record" to warn her that George Moore had decided to place J.R. at Rock Terrace, and "to be ready for a fight."

87.    Ms. Aswall said that she would walk N.R. to the compliance office after the meeting was over to file for a Due Process Hearing.

88.    The CIEP meeting was held later that morning and, just as Ms. Aswall warned, Mr. Moore insisted on placing J.R. at Rock Terrace over the objections of the parents and Dr. Dosovitz.

89.     The parents expressed their strong disagreement with the decision.  It was very clear to all who participated in the meeting that the decision to place J.R. at Rock Terrace had been made prior to the meeting.

90.     No one at the CIEP meeting responded to the parents' concerns and protest at the placement "decision."

91.     After the placement decision was made, Ms. Aswall walked the parents down the hall (as she had told N.R. that morning she would do) to the compliance office and advised them to submit a Due Process Complaint that day.  The parents then met with Ashley Vancleef, an MCPS compliance officer.

92.     In informal communications with the parents and counsel, Ms. Vancleef expressed confidence that the situation could be resolved, with J.R. attending Ivymount.

93.     However, MCPS refused to reverse the placement decision and maintained that J.R. should attend Rock Terrace.

94.     In a letter on August 20, 2015, J.R.'s parents notified MCPS that he would be attending Ivymount for the 2015-16 school year and reserved the right to seek public funding for this placement.

95.     On August 27, 2015, J.R.'s parents filed a Due Process Complaint alleging that MCPS had failed to provide their son a FAPE through its predetermination and selection of Rock Terrace.

96.     On or about this time, the parents contacted Dr. Laura Solomon, a special education expert, to observe their son at Ivymount, conduct an evaluation, and render an opinion on an appropriate program for J.R.

-13-

97.     In advance of the Due Process Hearing, the parties exchanged document requests pursuant to the Maryland Regulations governing practice before the Office of Administrative Hearings.

98.     On September 17, 2015, the parents requested that MCPS produce documents covering various areas, including all handwritten notes taken by MCPS staff during IEP and CIEP meetings concerning J.R., and all documents regarding the effectiveness of the Rock Terrace program.

99.     On September 21, 2015, MCPS requested documents from the parents covering various areas, including all correspondence to and from Ivymount and Dr. Solomon.

100.    On October 15, 2016, MCPS responded to the parents' document request. The MCPS response contained only five pages on Rock Terrace.

101.    The MCPS response did not contain any handwritten notes from the June and August 2015 CIEP meetings.

102.    The parents responded to the MCPS request for production of documents on October 16, 2015, providing over two thousand pages.

103.    The parents supplemented their response to the MCPS request on six additional dates in October and November pursuant to their continuing obligation under the Maryland Regulations.

104.    On October 26, 2015, MCPS requested additional documentation from the parents not present in the initial or subsequent responses, noting its "good faith effort" to obtain the additional documents and avoid a discovery dispute.

105.    The parents wrote on October 28, 2015, clarifying their response to the school system's renewed request, and including additional documentation relevant to the initial request.

106.    The parents also indicated in their October 28th letter their own concern that MCPS had failed to respond to their document request concerning evidence on the Rock Terrace School.

107.    In the October 28th letter, the parents again requested such documentation while also providing examples of Rock Terrace documentation independently obtained from MCPS sources that were omitted from the school system's response.

108.    The parents also noted in their October 28th letter their own good faith effort to obtain the requested documents and avoid a discovery dispute.

109.    Though the parents continued to provide additional documentation to MCPS, they never received a response to their October 28th letter regarding the missing Rock Terrace documents.

110.    On or about November 10, 2015, counsel for MCPS stated in a phone call with counsel for the parents that his client did not have any additional documents responsive to the Rock Terrace request.

112.    The parents' counsel independently unearthed significant evidence in the possession of MCPS that was relevant to their discovery request, but much of this evidence was not discovered until after the five-day disclosure deadline for the Due Process Hearing.

113.    On two separate occasions, including a letter to MCPS counsel on November 9, 2015, counsel for the parents warned that the MCPS actions had created a discovery dispute and

that they would seek sanctions from the ALJ if MCPS did not turn over all of the responsive documentation in its possession.

114.    MCPS did not provide the responsive documentation prior to the start of the Due Process Hearing.

115.    Consequently, the parents were forced to begin the Due Process Hearing without use of the responsive documents on Rock Terrace.

116.    The Due Process Hearing began on November 16, 2015.

117.    On November 17, 2015 the parents filed a motion for sanctions based upon discovery violations. The ALJ took the motion under advisement and the parents' case proceeded.

118.    In response to continued argument on November 20, 2015, the fifth day of the Due Process Hearing, MCPS finally produced Rock Terrace documents responsive to the parents' request.

119.    The documents produced by MCPS on the fifth day of the Due Process Hearing showed that Rock Terrace staff have significant concerns about their ability to handle students with behavioral issues.

120.    The documents produced by MCPS on the fifth day of the Due Process Hearing also demonstrated that Rock Terrace staff were unsure how to effectively take data on students.

121.    The documents produced by MCPS on the fifth day of the Due Process Hearing portrayed serious safety concerns at Rock Terrace necessitating the cessation of CIEP student referrals to the school.

122.    The documents produced by MCPS on the fifth day of the Due Process Hearing did not include handwritten notes from any IEP or CIEP meeting.

123.    On December 3, 2015, the seventh date of the Due Process Hearing, the parties again discussed the continuing MCPS failure to produce handwritten notes pursuant to the parents' initial discovery request.

124.    On December 3, 2015, the ALJ ordered MCPS to produce these notes after MCPS witnesses testified that such notes existed.

125.    MCPS counsel agreed and stated that he would provide any additional applicable handwritten notes not yet produced without the need for a motion to compel.

126.    On December 8, 2015, the parents provided a list to MCPS of all such requested documents.

127.    Contrary to his agreement during the hearing, MCPS counsel responded by email, stating: "Your requests are rejected until you provide me with your authority for making them."

128.    On December 9, 2015, the parents filed a motion to compel the production of the handwritten notes identified on December 8, 2015.

129.    Later that day on December 9, 2015, MCPS counsel responded by providing fifty-two pages of handwritten notes from Mr. Moore, Ms. Kathy Lertora of Rock Terrace, and Ms. Joyce Sternstein of the MCPS placement office.

130.    In a follow-up letter to the ALJ, MCPS counsel wrote that he would refuse to provide handwritten notes for anyone else who attended the IEP and CIEP meetings at issue.

131.    The parents presented five witnesses at the Due Process Hearing, B.R. and N.R., Dr. Dosovitz, Dr. Laura Solomon, and Dr. Lauren Lestremau of Ivymount.

134.    B.R. and N.R. testified about the IEP process, the MCPS staff communications to their family, their belief that Rock Terrace was not appropriate for J.R., and that J.R. had successfully transitioned to Ivymount and was doing well there.

135.    Dr. Dosovitz testified as an expert in psychiatry regarding his history dealing with J.R.'s behavioral needs and his opinion on where J.R. should attend school.

136.    Dr. Solomon testified as an expert in special education about her observations at Rock Terrace, her observation of J.R. at Ivymount, and J.R.'s educational and behavioral needs.

137.    Dr. Solomon testified that the main impediment to J.R. making academic progress is, and has been, recognizing and ameliorating behaviors.

138.    Dr. Solomon testified that she participated in many years of IEP meetings with Mr. Moore, and that he controls the CIEP meetings and sharply rebukes those who disagree with him.

139.    Dr. Solomon testified to a recent example wherein other MCPS members of a CIEP team did not agree with Mr. Moore, and that he was verbally dismissive of them and overrode their objections.  Mr. Moore was present for Dr. Solomon's testimony and did not dispute it in responsive testimony.

140.    Dr. Lestremau testified as an expert in special education with an emphasis in behavioral management about the Ivymount program, J.R.'s progress, and J.R.'s educational needs.

141.    Dr. Lestremau testified that J.R. requires consistent data to be taken on his behaviors so that his non-compliance can be tracked and his behaviors altered.

142.    Dr. Lestremau testified that the Ivymount program tracks J.R.'s behavior in five-minute increments throughout the day using a one-to-one aide.

143.    Dr. Lestremau testified that Ivymount could prove that its approach to managing J.R.'s behaviors is effective because Ivymount staff conducted an experiment wherein they removed the program supports in order to ascertain a baseline.

144.    Dr. Lestremau testified further that, after the program supports were removed, J.R.'s behavior regressed with significant increase in non-compliance and other problematic behaviors.

145.    Dr. Lestremau testified further that J.R.'s maladaptive behaviors went away after the Ivymount program protocols were reinstituted.

146.    MCPS presented five witnesses: Dr. Reiser, Mr. Moore, Ms. Lertora, Ms. Aswall, and Donna Danielli, J.R.'s former teacher at High Road.

147.    Dr. Reiser testified as an expert in school psychology regarding her evaluation of J.R.

148.    Mr. Moore testified as an expert in special education with an emphasis in student placement, about the CIEP process. He denied predetermining J.R.'s placement before the CIEP meeting.

149.    Mr. Moore also testified that Ivymount was an excellent school and that MCPS places students there.

150.    Ms. Lertora testified as an expert in special education about the Rock Terrace program and her involvement at the August 2015 CIEP meeting.

151.    Ms. Lertora admitted that there were many staff at Rock Terrace who had complained about issues dealing with students with severe behaviors.

152.    Ms. Lertora admitted that she had not read all of J.R.'s educational file when she attended the August 2015 CIEP meeting and did not know about many of the behaviors J.R. exhibited at High Road.

153.    Ms. Lertora admitted to closing Rock Terrace to new students during the 2014-2015 school year because the school lacked sufficient staff to handle student behaviors.

154.    Ms. Aswall testified as an expert in special education placement and denied having made a number of the statements attributed to her by Dr. and N.R.

155.    Ms. Aswall also admitted to having a significant memory problem; she testified that one example of her memory deficits was that she could not remember how old she is.

156.    Ms. Aswall specifically testified that she has difficulty remembering conversations.

157.    Ms. Danielli testified about J.R.'s progress at High Road and that he was not behaviorally disruptive.  However, Ms. Danielli admitted that many documents in the record from High Road showed that J.R. had in fact been extremely behaviorally disruptive and physically aggressive requiring removal from the classroom as well as suspension.

158.    Ms. Danielli admitted that she wrote numerous behavioral reports describing J.R.'s issues with non-compliance and explosive behavior in the classroom at High Road.

159.    The parents submitted a written closing memorandum of law on January 12, 2016.

160.    The parents submitted a detailed supplemental written closing memorandum on the facts of the case on January 15, 2016.

161.    The ALJ issued her decision on February 11, 2016.

162.    Contrary to the clear factual record, the ALJ determined that J.R.'s lack of academic progress over the past few years was due to his cognitive disability and not his behaviors.

163.    Contrary to the clear factual record, the ALJ found that J.R.'s behavior improved while he was at High Road.

164.    The ALJ ignored substantial evidence demonstrating that J.R. had made no progress on his behavioral goals while at High Road.

165.    Contrary to the clear factual record, the ALJ declined to find that J.R.'s placement at Rock Terrace was predetermined.

166.    The ALJ found N.R. credible on what statements Ms. Aswall made to her, but determined that Ms. Aswall did not speak for the CIEP team.

167.    The ALJ found that, even if Mr. Moore had predetermined to place J.R. at Rock Terrace, that he did not speak for the CIEP team.

168.    Contrary to the clear factual record, the ALJ ignored the unrebutted testimony that Mr. Moore controls the outcomes of CIEP meetings.

169.    Without explanation, the ALJ illogically found that sending the referral letters to Katherine Thomas and Ivymount were evidence that predetermination had not taken place.  The ALJ failed to acknowledge the evidence that Mr. Moore's predetermination of J.R.'s placement at Rock Terrace occurred after the June 2015 meeting when the letters were sent to Ivymount and KTS.

170.    Without explanation, the ALJ disregarded Dr. Solomon's testimony about Rock Terrace.

171.    The ALJ found the MCPS discovery violations harmless because, in her view and contrary to the clear factual record, Rock Terrace's ability to manage student behavior and track student data were not significant issues because behavior and data tracking were not relevant to J.R. making academic progress.  The ALJ failed to recognize that J.R.'s behavior was the primary impediment to his academic progress and that any school in which he was placed would need to be adept at data keeping and behavioral management.

172.    The ALJ erroneously concluded that the parents had sufficient opportunity to address the Rock Terrace documents even though they were not timely produced and were, in fact, provided after the parents completed all or the greater portion of their case.

173.    Over the course of the 2015-2016 school year at Ivymount, J.R. has made meaningful academic progress.

174.    With Ivymount's behavioral and academic approach, J.R. currently reads at the second grade level, four reading levels higher than when he started at Ivymount in August 2015.

175.    The ALJ's findings of fact are not regularly made.

176.    The ALJ applied an incorrect legal standard in reaching her decision.

177.    The plaintiffs are aggrieved by the ALJ's decision.

178.    The plaintiffs have exhausted their administrative remedies.

## COUNT I

179.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 178.

180.     Defendants' failure to provide J.R. with a free appropriate public education violates plaintiffs' rights under the IDEA and Maryland law.

## COUNT II

181.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 178.

182.     Defendants' failure to provide J.R. with an appropriate educational placement violates plaintiffs' rights under the IDEA and Maryland law.

## COUNT III

183.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 178.

184.     Defendants' predetermination of J.R.'s educational placement denied J.R. a free appropriate public education and violates plaintiffs' rights under the IDEA and Maryland law.

## COUNT IV

185.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 178

186.     Defendants' failure to timely provide documentation responsive to plaintiffs' document requests violates plaintiffs' right to Due Process under Maryland law.

## COUNT V

187.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 178.

188.    The ALJ committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law, by failing to render a proper decision based on an accurate and impartial understanding of the facts and law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Issue judgment for plaintiffs and against defendants;

2.    Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3.    Issue injunctive relief, vacating the decision of the ALJ and ordering defendants to reimburse plaintiffs for the costs associated with enrolling J.R. at the Ivymount School for the 2015-16 school year;

4.    Order defendants to place and fund J.R. at the Ivymount School for the 2015-16 school year and declare it to be his current educational placement under the IDEA;

5.    Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6.    Award any other relief that this Court deems just.


Respectfully Submitted,


_____
/s/
Paula A. Rosenstock     #09798


_____
/s/
Michael J. Eig     #07718

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Plaintiffs

-24-