IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

J.R., *et al.*

v.                              :    Civil Action No. DKC 16-1633

DR. JACK R. SMITH, *et al.*

**MEMORANDUM OPINION**

Presently pending and ready for resolution are: (1) a
motion for summary judgment filed by Plaintiffs J.R., N.R., and
B.R. ("Plaintiffs") (ECF No. 15); (2) a cross motion for summary
judgment filed by Defendants Montgomery County Board of
Education and Dr. Jack R. Smith ("Defendants") (ECF No. 25); and
(3) a motion for additional evidence filed by Plaintiffs (ECF
No. 16). The issues have been briefed, and the court now rules,
no hearing being deemed necessary. Local Rule 105.6. For the
following reasons, Plaintiffs' motions for summary judgment and
for additional evidence will be denied, and Defendants' cross
motion for summary judgment will be granted.

**I.    Background**

**A.    The Individuals with Disabilities Education
        Improvement Act**

The Individuals with Disabilities Education Improvement Act
("IDEA"), 20 U.S.C. § 1400 *et seq.*, requires all states that

receive federal funds for education to provide each child who has a disability with a free and appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). To assure delivery of a FAPE, the IDEA requires a school district to provide an Individualized Education Program ("IEP") for each child determined to be disabled. 20 U.S.C. § 1414(d).[1] The IEP must state the student's current educational status, the annual goals for the student's education, the special educational services and other aids that will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," *i.e.*, spend time in school environments with non-disabled students. 20 U.S.C. § 1414(d)(1)(A). The student's IEP is formulated by a team ("IEP team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results and evaluations of the child, and, when appropriate, the child himself. 20 U.S.C. § 1414(d)(1)(B). Based on the student's IEP, his IEP team will select a school that can provide him a FAPE. The student must be placed in the least restrictive environment ("LRE") appropriate to the child's needs, with the disabled child

---

[1] Maryland's regulations governing the provision of a FAPE to children with disabilities in accordance with the IDEA are found at Md. Code Regs. 13A.05.01.

participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550. "The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the Act also provides for placement in private schools at public expense where this is not possible." *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) (citing 20 U.S.C. § 1412(5); 34 C.F.R. §§ 300.132, 300.227, 300.307(b), 300.347).

The IDEA also provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 527 (4th Cir. 2002) (citation omitted); *see also* 20 U.S.C. § 1415. If the parents believe that the school district is not providing a FAPE, they may present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents are entitled to request a due

process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(f).[2]

Parents challenging an IEP team's school choice "may place the child in a private school and seek reimbursement for the cost of the private school." *See Burlington*, 471 U.S. at 369–70. Parents who unilaterally change their child's placement "do so at their own financial risk." *Id.* at 373-74. In order to be entitled to reimbursement for unilateral private placement, the court or hearing officer must find "both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993).

## B.   Factual Background[3]

J.R. is a seventeen-year-old student with a long history of behavioral, emotional, and academic difficulties. (ALJ Decision, at 12-13). He has multiple disabilities, including an intellectual disability, a hearing impairment, and a health impairment due to a rare disorder called KBG Syndrome. (*Id.* at

---

[2]   In Maryland, the Maryland Office of Administrative Hearings conducts due process hearings. Md. Code Ann., Educ. § 8-413; Md. Code Regs. 13A.05.01.15(C)(1).

[3] Unless otherwise noted, all facts are from the Findings of Fact in the ALJ Decision below. There is no evidence that these particular findings by the ALJ were not regularly made, thus these findings are *prima facie* correct. *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991).

12).  These disabilities qualify J.R. for special education services under the IDEA.  (*Id.*).

J.R. has been educated under an IEP for his entire formal education.  (*Id.*).  In 2007, tests evaluating J.R.'s intellectual ability placed him in the "low average" range with specific learning disabilities.  In the fourth grade, Defendant Montgomery County Public Schools began funding private school education for J.R. at the Frost School, which specializes in students with significant behavioral problems, but teaches academics at grade level. (*Id.* at 13).  He went to the Frost School for the fourth, fifth, and part of the sixth grade, and attended High Road Academy ("High Road") for the remainder of the sixth grade through the end of the eighth grade in 2015. (*Id.* at 12).  High Road is a school for students with learning disabilities who are still pursuing a high school diploma, but the school is not designed for children with extreme behavioral issues.  (*Id.* at 13).  J.R. made minimal educational progress during his time there.  (*Id.*).  His behavior did improve over time at High Road, but he continued to exhibit behavioral issues that were described as low frequency, but high intensity throughout his time there.  (*Id.* at 14).

High Road was willing to keep J.R. for its high school program, but, at the suggestion of one of Plaintiffs'

consultants, Dr. Joseph Beiderman, his parents proposed transitioning J.R. out of the diploma track program and into a less difficult certificate track program. (*Id.* at 16). Before removing J.R. from a diploma track, his IEP team decided to do a reevaluation of his intellectual ability. (*Id.*). Defendants' School Psychologist Dr. Dietra Reiser conducted several tests as part of the re-evaluation, the results of which showed that J.R. was in the "lower extreme" of intellectual ability, scoring below the 0.1 percentile on one test and scoring the equivalent to an IQ of 47. (*Id.* at 16-17). Given these results, Dr. Reiser found that J.R. should be in a program for students with an intellectual disability rather than specific learning disabilities. (*Id.* at 17-18). Because High Road did not offer a certificate program, J.R. was referred to the school district's Central IEP ("CIEP") team, which oversees school placements. (*Id.* at 17). At a meeting on June 9, 2015, J.R.'s CIEP team agreed that he should be moved to a certificate track program. (*Id.* at 18).

Prior to the June 9 meeting, the school district had discussed only two certificate track schools with J.R.'s parents: Ivymount and the Katherine Thomas School. (*Id.* at 17). At the meeting, however, George Moore, the chair of J.R.'s CIEP team, proposed Rock Terrace School ("RTS"), a public school

designed for students with significant cognitive disabilities and complex emotional, behavioral, or sensory needs. (*Id.* at 18, 20). The CIEP team continued their meeting to allow Plaintiffs to visit RTS, and reconvened on August 7 to make a final decision. (*Id.* at 18). In the meantime, J.R. applied to and was accepted by Ivymount. (*Id.*).

At the August 7 meeting, RTS principal Dr. Katherine Lertora explained in some detail that she had reviewed J.R.'s file and believed that RTS would be an appropriate placement for him. (*Id.* at 19). Plaintiffs had concerns about the behavior management capabilities, teaching methods, and class sizes at RTS, and preferred Ivymount. (*Id.* at 18-19). Over the objection of J.R.'s parents, the CIEP team decided to place him at RTS for the 2015-16 school year. (*Id.* at 19).

C.   **Procedural Background**

Rather than send J.R to RTS, Plaintiffs enrolled him at Ivymount and filed a due process complaint against Defendants for reimbursement. (ALJ Decision, at 19). An administrative law judge ("ALJ") held a due process hearing for Plaintiffs beginning in November 2015, and issued a decision on February 12, 2016, finding that Defendants' placement of J.R. at RTS was reasonably calculated to provide a FAPE. (*Id.* at 43).[4]   As

_____

[4] Details of the ALJ's decision are discussed further below.

discussed more fully below, the ALJ also found that the CIEP team had not pre-determined where it would send J.R. prior to the August 7 CIEP team meeting, and that certain discovery issues that occurred during the hearing did not diminish the efficacy of Plaintiffs' case. (*Id.* at 45).

Plaintiffs appealed that administrative ruling by filing suit against Defendants in this court on May 25, 2016. (ECF No. 1).[5] The administrative record was filed with the court on June 6, 2016, and the parties, expecting that the case could be resolved on cross-motions for summary judgment, set a briefing schedule that was set to conclude on January 9, 2017. (ECF Nos. 7; 11). After an extension of time, the parties completed filing their cross-motion papers on January 19. (ECF Nos. 15; 25; 26; 29). Shortly thereafter, on January 31, the parties filed a consent motion to hold the case in abeyance pending the outcome of a case in the Supreme Court of the United States, *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988 (2017), which was set to review the FAPE standard. (ECF No. 30). That motion was granted (ECF No. 31), and the case was stayed until *Endrew F.* was decided. After the Supreme Court issued its opinion on March 11, the parties submitted

---

[5] Decisions by the Maryland Office of Administrative Hearings can be appealed to the United States District Court for the District of Maryland under Md.Code Ann., Educ. § 8-413(j).

additional briefing as to the effect of *Endrew F.* (ECF Nos. 32-35). Plaintiffs have also filed a motion for additional evidence, which has been briefed in full. (ECF Nos. 16; 21; 22).

**D. Supplemental Briefing Addressing *Endrew F.***

Before addressing the merits of this case, it is necessary to consider whether the Supreme Court's decision in *Endrew F.* compels the remand of the case to the ALJ for a decision under the *Endrew F.* standard. Plaintiffs argue that a remand is required because the ALJ applied the "more than *de minimus*" standard that the Supreme Court rejected in *Endrew F.* (ECF No. 34, at 6-8). The primary holding of the Supreme Court's decision in *Endrew F.* was its rejection of this standard, which the United States Courts of Appeals for the Fourth Circuit and the Tenth Circuit had applied previously. *See O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 358-60 (4th Cir. 2015); *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 798 F.3d 1329, 1338-41 (10th Cir. 2015). The Supreme Court held that the statutory language of the IDEA demanded more than the Tenth Circuit had required, and it articulated a new standard: "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

9

*Endrew F.*, 137 S.Ct. at 999. According to the Court, a student's placement must include "challenging objectives" that are "appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.* at 1000.

Plaintiffs contend that the ALJ applied the now-invalid Fourth Circuit standard from *O.S.*, and that the decision should be vacated so that the new standard can be applied. (ECF No. 34, at 8). Plaintiffs' argument, however, is more focused on the Supreme Court's rejection of the Fourth Circuit standard than the standard that the ALJ actually applied in this case. As Defendants point out, the ALJ never cited *O.S.* in her decision. Rather, she focused on whether the placement of J.R. at RTS was "reasonably calculated to enable the child to receive educational benefits." (ALJ Decision, at 21 (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982))). She noted that courts had defined the word "appropriate" in a FAPE to require "personalized instruction with sufficient support services to permit the student to benefit," and cited to older Fourth Circuit precedent that required that a placement be calculated "to enable [a student] to receive *appropriate* educational benefit." (*Id.* at 22). The ALJ also emphasized that an IEP "must be tailored to

the student's particular needs," taking into account the strengths of the child, the concerns of the parent, the results of evaluations, and the academic, developmental, and functional needs of the child. (*Id.*). In short, even though the ALJ made her decision prior to the Supreme Court's articulation of the *Endrew F.* standard, she went beyond the "more than *de minimus*" standard from *O.S.* and laid out an approach that evaluated what progress was appropriate in light of the child's circumstances, just as *Endrew F.* requires.[6]

## II. Motions for Summary Judgment

### A. Standard of Review

In *M.M. ex rel. D.M.*, 303 F.3d at 530-31 (internal quotation marks and citations omitted), the Fourth Circuit explained the standard of review for motions for summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified *de novo* review, giving due weight to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be *prima facie* correct,

---

[6] In their supplemental response, Plaintiffs refined and reiterated several of the arguments they made in their motion for summary judgment in light of the *Endrew F.* decision. (ECF No. 34, at 8-15). The Supreme Court's analysis in *Endrew F.* provides helpful guidance material on the issues, but the Court made no other significant changes to the applicable law. Accordingly, these arguments are reviewed in the context of the merits of the parties' motions for summary judgment.

and if a reviewing court fails to adhere to
them, it is obliged to explain why. The
court is not, however, to substitute [its]
own notions of sound educational policy for
those of local school authorities.

General standards of review for summary judgment motions also
apply in IDEA cases, as illustrated in *Board of Education of
Frederick County v. I.S. ex rel. Summers*, 325 F.Supp.2d 565, 578
(D.Md. 2004):

In addition, the Court's analysis is
shaped by the mandate of Rule 56(c) of the
Federal Rules of Civil Procedure that
summary judgment "shall be rendered
forthwith if the pleadings, depositions,
answers to interrogatories, and admissions
on file, together with the affidavits, if
any, show that there is no genuine issue as
to any material fact and that the moving
party is entitled to judgment as a matter of
law." "When the moving party has met its
responsibility of identifying the basis for
its motion, the nonmoving party must come
forward with 'specific facts showing that
there is a genuine issue for trial.'" *White
v. Rockingham Radiologists, Ltd.*, 820 F.2d
98, 101 (4th Cir. 1987) (quoting *Celotex
Corp. v. Catrett*, 477 U.S. 317, 324 (1986);
Fed.R.Civ.P. 56(e)). The Court's function
is limited to determining whether sufficient
evidence supporting a claimed factual
dispute exists to warrant resolution of the
matter at trial. *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986). In that
context, a court is obligated to consider
the facts and all reasonable inferences in
the light most favorable to the nonmoving
party. *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587
(1986). Where, as here, cross-motions for
summary judgment are filed, a court must
"evaluate each party's motion on its own

12

merits, taking care [in each instance] to
draw all reasonable inferences against the
party whose motion is under consideration."
*Mingus Constructors, Inc. v. United States*,
812 F.2d 1387, 1391 (Fed.Cir. 1987).

This standard of review creates a challenging path for Plaintiffs in IDEA cases for several reasons. First, just as Plaintiffs were required to carry the burden of proof in the administrative hearing, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005), they also must carry that burden in this action, *I.S. ex rel. Summers*, 325 F.Supp.2d at 578 ("[T]he party challenging the administrative findings . . . bears the burden of proof of establishing a violation of the IDEA."); *see also Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md. 1999). Second, "[i]f the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanagh*, 75 F.Supp.2d at 457 (citing *Doyle*, 953 F.2d at 103). Moreover, in according "due weight" to the findings of the ALJ, this court owes deference to the ALJ's determinations of witness credibility.

The parties argue at some length as to how the "due weight" standard of review applies. Citing *Doyle*, Plaintiffs argue that the case law focuses primarily "on preserving the findings of the trier of fact that are most subjective and most difficult to determine after the fact." (ECF No. 26, at 3). They seem to

13

draw a distinction between determinations of "believability" and determinations of persuasiveness or factual validity. For example, they maintain that the ALJ's determination that Dr. Solomon was incorrect that the Ivymount approach is the only way for J.R. to learn is merely a "factual determination . . . where she weighs evidence and comes to a conclusion." (ECF No. 26, at 5 (citing *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004))). The Fourth Circuit in *Lawson* made clear that these types of determinations are entitled to "due weight" deference, reversing the district court's decision specifically because the district judge had substituted his own findings in the place of the ALJ's determinations on such issues. *Id.* at 328-30. The *Doyle* decision also went beyond merely the "most subjective" findings, emphasizing that even the over-arching decision of "whether or not a program is appropriate is a matter of fact," and adopting a standard "in line with" the holding in *Kerkam v. McKenzie*, 862 F.2d 884 (D.C.Cir. 1988), that such findings of fact, if made "in a regular manner and with evidentiary support[,] are entitled to *presumptive validity*." *Doyle*, 953 F.2d at 105 (emphasis added). Thus even if there is a distinction between the deference owed to the ALJ's determinations of "believability" and her factual determinations based on which providers of conflicting factual testimony she

14

found more persuasive, the latter is still entitled to a presumption of validity unless the evidence shows that she "departed from the fact-finding norm" in "the way in which [she] arrived at [her] administrative decision" or the "methods [she] employed." *Id.*

Confusingly, after expounding on this distinction, Plaintiffs seem to agree that persuasiveness determinations are entitled to some deference. Plaintiffs thus properly turn their focus to whether the ALJ's determinations "have evidentiary support," arguing that many of the ALJ's findings "are contrary to the evidence in the record." (ECF No. 26, at 7 (citing *Cavanagh*, 75 F.Supp.2d at 457). Even if there is some evidence in the record that conflicts with the ALJ's determinations, however, "the ALJ's resolution of conflicting expert testimony," in which she "implicitly find[s] [some testimony] unconvincing while crediting the contrary views of [other testimony]" is entitled to presumptive validity. *Lawson*, 354 F.3d at 327-28. Thus, so long as her determinations have some evidentiary support, Plaintiffs must show an imbalance in the evidence that demonstrates that the ALJ's conclusion as to the persuasiveness of one side was "reached through a process that is far from the accepted norm of a fact-finding process." *J.P. ex rel Peterson v. Cty. Sch. Bd. of Hanover Cty.*, 516 F.3d 254, 259 (4th Cir.

2008) (*quoting Cty. Sch. Bd. of Henrico Cty. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005)).

**B.    Was J.R.'s Placement at RTS reasonably calculated to provide a FAPE?**

As this court emphasized in *Wagner v. Board of Education of Montgomery County*, 340 F.Supp.2d 603 (D.Md. 2004), the standard of review in IDEA reimbursement cases means that Plaintiffs face an uphill battle.  Given the circumstances here, Plaintiffs' task is even more challenging because Plaintiffs and Defendants agreed prior to the placement to make significant changes to J.R.'s IEP, namely, transitioning from a diploma track to a certificate track.  This case is thus unlike the cases in which a school district proposes a plan and a placement that are "pretty much the same as his past ones."  *Endrew F.*, 137 S.Ct. at 996.  Here, Defendants proposed both a new program and a new placement for the 2015-16 school year.  Therefore, it is not enough for Plaintiffs simply to show that Defendants failed in previous years, because the proposed placement at RTS was significantly different than Defendants' past placements.  It is also insufficient to show that J.R. has had success at Ivymount.  Because Ivymount and RTS share some similarities, including being certificate track programs, J.R.'s success at Ivymount does not necessarily indicate that he would not have had the same success at RTS.  Rather, Plaintiffs must show that J.R.

16

would not have made appropriate educational progress at RTS, that it was an unreasonable calculation by Defendants to believe that he might, and that the ALJ determination that Defendants' calculation was reasonable was unsound given the information available to her. Plaintiffs have not met this high bar.

Plaintiffs first argue that "the ALJ improperly weighed the evidence put before her, blindly crediting [Defendant] and substituting her own notion for why J.R. has not advanced academically over the last nine years over the expertise of those who actually work with him on a daily basis." (ECF No. 15-1, at 31). They contend that evidence clearly showed that Defendants had repeatedly evaluated J.R. incorrectly – specifically, improperly labelling him as emotionally disabled and learning disabled – leading to J.R. being "miseducated for most of his life." (*Id.* at 32 (emphasis removed)). They argue that, despite Defendants' repeated failures to understand J.R.'s needs, the ALJ credited testimony from Defendants' witnesses who had never met J.R. and "dismissed entire days worth of testimony" from Plaintiffs' witnesses who knew him. (*Id.* at 36). They contend that the testimony of one of their witnesses, Dr. Lauren Lestremau, who worked with J.R. at Ivymount, "does not appear anywhere in the ALJ's conclusions." (ECF Nos. 15-1, at 36; 26, at 10). They maintain that the ALJ's failure to

17

discuss or distinguish the greater familiarity with J.R. of Plaintiffs' witnesses warrants overturning the administrative decision.

Although the ALJ could possibly have provided more explanation as to why she credited certain witnesses more than others, nothing in the record suggests that her determinations were not regularly made. She may not have expounded on how well each witness knew J.R., but she explicitly noted how familiar at least some of the key witnesses were. For example, she acknowledged that Ms. Lertora had not met or observed J.R., but the ALJ found that Ms. Lertora's time spent reviewing J.R.'s file offset that lack of knowledge to at least some degree. (ALJ Decision, at 35-36). She similarly noted that Plaintiffs' witness Dr. Ira Dosovitz appeared to know J.R. "almost as well as the Student's Parents." (*Id.* at 42). Thus, although the ALJ did not specifically describe each witness's familiarity with J.R., it is clear that she considered familiarity with him as a factor as she evaluated the testimony of the witnesses.

Plaintiffs are also incorrect that Dr. Lestremau's testimony does not appear in the ALJ's decision. (*See* ALJ Decision, at 11, 38-39). Although the ALJ discussed Dr. Lestremau's testimony less than that of other witnesses, the ALJ's limited references do not show that she failed to reach

18

her conclusions soundly. Plaintiffs have pointed to no cases suggesting that an ALJ must describe the testimony of every witness who testifies at a hearing. Indeed, other courts have upheld ALJ decisions making only minimal reference to certain witnesses. *See, e.g.*, *Lawson*, 354 F.3d at 329 (noting that an ALJ decision that mentioned one witness only "in passing" does not indicate a failure to consider the testimony, but rather that the ALJ "obviously found the testimony . . . unpersuasive"). Here, Dr. Lestremau testified primarily as to the details of Ivymount's educational approach and how the system was working for J.R. in the period prior to the hearing. (ECF No. 15-1, at 14). As noted above, however, the determinative question to the ALJ's decision was whether the RTS placement was calculated to provide a FAPE, not whether Ivymount was capable of providing one. (ALJ Decision, at 43). She found the testimony as to J.R.'s success at Ivymount immaterial to this question. (*Id.*). Unsurprisingly, then, the ALJ focused primarily on the testimony of Dr. Solomon, who was familiar with both Ivymount and RTS. Therefore, the ALJ's decision not to reference Dr. Lestremau furtherdoes not show that she failed to consider the testimony or that she reached her conclusions in an irregular manner.

In their supplement to the motion based on *Endrew F.*, Plaintiffs argue that the ALJ failed to follow *Endrew F.*'s directive to focus on how an IEP will provide academic and functional advancement when she disregarded the evidence of success at Ivymount as immaterial. (ECF No. 34, at 9). The ALJ did not outright ignore the evidence of success at Ivymount. Indeed, Plaintiffs acknowledge both that "the ALJ actually credited [] evidence [of] 'the apparent success the Student is enjoying at Ivymount'" (ECF No. 34, at 8 (quoting (ALJ Decision, at 43))), and that "[t]he ALJ actually acknowledged . . . 'that the [J.R.'s previous schools] have not resulted in academic progress,'" (ECF No. 34, at 9 (quoting (ALJ Decision, at 41-42))), while simultaneously arguing that the ALJ refused to consider such evidence. The ALJ noted the improvement, but reasoned that J.R. was likely "happier" and performing better because of his switch from a diploma track to a certificate program. (ALJ Decision, at 40.) The ALJ noted that this change put J.R. in "an academic environment more appropriate to his cognitive abilities," but because both RTS and Ivymount were certificate programs, she found the Ivymount evidence unhelpful to the parents' attempts to distinguish the two schools. (*Id.*). As the Court noted in *Endrew F.*, "crafting an appropriate program of education requires a *prospective* judgment by school

20

officials." *Endrew F.*, 137 S.Ct. at 999 (emphasis added). Such was the point that the ALJ was making when she referred to J.R.'s subsequent success at Ivymount as "immaterial." She did not refuse to consider his Ivymount performance outright, but, rather, explained that J.R.'s success at Ivymount was unhelpful in determining whether RTS would have failed to provide J.R. with a FAPE. Parents seeking reimbursement for a unilateral private placement must first show that the proposed placement would not have provided a FAPE, and then show that the parental placement was successfully providing a FAPE. Because the ALJ had found that RTS would have provided a FAPE, she considered his success at Ivymount at step two immaterial.

Plaintiffs next argue that the ALJ was not weighing the evidence in a regular manner when she concluded that the Ivymount data-keeping approach was not necessary in order to provide J.R. a FAPE. They contend that the ALJ reached two faulty conclusions that were not supported by the evidence: "1) that his behavior improved significantly at High Road and yet he still failed to make academic gains; and 2) his lack of academic progress can be explained by his cognitive deficits." (ECF No. 15-1, at 37).

As an initial matter, Plaintiffs misconstrue the ALJ's reasons for rejecting Dr. Solomon's contention that only the

Ivymount approach would work for J.R.  The ALJ did clearly state that "the objective evidence is that the Student's poor academic progress is the result of cognitive deficits, not behavioral interference." (ALJ Decision, at 38).  Her second reason for rejecting Dr. Solomon's conclusion, however, was that J.R.'s behavior at Ivymount appeared no better to her than it had been at High Road.  (*Id.* at 38-39).  She reached this conclusion after making an extensive comparison between J.R.'s behavioral issues during the 2014-15 school year at High Road and his behavioral issues during the first part of the 2015-16 school year at Ivymount.

The ALJ did make several references to J.R.'s behavior improving at High Road, but the point of these references was that his failure to make academic progress during periods of improved behavior were additional evidence that supported the results of the cognitive ability test, which showed J.R. to be in the low extreme range.  In the sentence just after the above reference to J.R.'s cognitive deficits, for example, the ALJ stated that "the Student's behavior has improved since the fourth grade, when he was transferred to Frost, but his academic performance has remained essentially flat." (ALJ Decision, at 38).  Because evidence of J.R.'s behavioral improvements at High Road was supplementary to the test data, even if, as Plaintiffs

contend, J.R.'s behavior had not improved at High Road, it would not necessarily show that the ALJ's conclusion was incorrect.

The ALJ, however, fully explained how she reached this conclusion. She noted for example that language in J.R.'s December 2013 Behavior Improvement Plan relating to removing him from class for aggressive and disruptive behavior had been removed on the same plans from February and March 2015. (*Id.* at 39). For that same period, she noted that Dr. Dosovitz had commented that J.R. had had a "very good" few months. (*Id.*). She also noted that High Road's records indicated that J.R. had no reported incidents of aggressive behavior after the first six months of eighth grade. (*Id.*). Plaintiffs' motion virtually ignores these final months of eighth grade, primarily referencing documents from December 2014. (ECF No. 15-1, at 38-39). They also fail to acknowledge that improvement is relative, emphasizing that J.R.'s April 2015 IEP still included a note that J.R. struggled "to de-escalate his emotions after he becomes upset" and "to demonstrate proper manners[] and positive decision making skills" in such incidents. (*Id.*). While some behavioral issues clearly persisted throughout his time at High Road, these comments do not undermine the significant difference between the types of behavioral incidents that were reported in from September 2014 through January 2015, and those incidents

23

reported from February 2015 through the end of the year. (*See* ALJ Decision, at 14-16). Moreover, the ALJ also noted that J.R.'s mother N.R. had confirmed that J.R.'s behavior had improved over the years, but that she attributed the improvement to better medical management. (*Id.* at 39). Thus, in spite of Plaintiffs' efforts to amplify the importance of evidence contrary to her conclusion, it is clear that the ALJ's determination was "made in a regular manner and [with] evidentiary support."

Plaintiffs also challenge the validity of the ALJ's determination that J.R.'s lack of academic progress was due to his cognitive deficits. (ECF No. 15-1, at 40). Plaintiffs primarily support this contention with evidence of J.R.'s academic improvements at Ivymount that has occurred since the administrative hearing. (*Id.* at 44-45). As discussed further below, some of that evidence was not considered by the ALJ and will not be considered here in reviewing her decision. Plaintiffs also challenge the ALJ's determination as to J.R.'s cognitive abilities based on the testimony at the hearing of Dr. Reiser and Dr. Solomon. They contend that Dr. Reiser administered only a single cognitive assessment, and that she admitted that the assessment "do[es] not measure intelligence in all its complexity." (*Id.* at 41). They emphasize that Dr.

24

Reiser also qualified her results to a finding that "[h]is cognitive abilities, *at least in part*, explain his slow academic progress," rather than fully attributing J.R.'s academic failures to his cognitive deficits, as they argue the ALJ did. (*Id.*). Plaintiffs also argue that Dr. Reiser failed appropriately to account for J.R.'s behavioral issues, several of which she seemed unaware of during her testimony. (*Id.* at 42). They maintain that the ALJ "relied exclusively upon Dr. Reiser's report and testimony, and [] both the report and Dr. Reiser's testimony indicated that her opinion left out crucial detail." (*Id.*). They contrast this with testimony from Dr. Solomon that despite J.R.'s lack of progress, "it isn't that he can't learn." (*Id.*).

Plaintiffs once again attempt to read the nuance out of the ALJ's decision. The ALJ did not find that J.R. could not learn, but rather that his complete lack of progress was a result of being in the wrong academic program, not merely behavioral issues. (ALJ Decision, at 38-40). Plaintiffs agreed that Frost and High Road, both diploma track programs, were too advanced for J.R., and all three of the school options discussed at the August 7 CIEP meeting were certificate track programs. All parties involved agreed that these programs would place J.R. in "an academic environment more appropriate to his cognitive

abilities." (*Id.* at 40). Indeed, that position is consistent with Dr. Solomon's testimony that one of the reasons for J.R.'s lack of progress was that "there hasn't been a change in [J.R.]'s programming in terms of how we approach him, how we attempt to instruct him to see what he can learn." (ECF No. 15-1, at 42). The complicated ways in which J.R.'s behavioral issues and academic issues interlocked amplify the difficulty of weighing either in isolation. As the ALJ noted, J.R.'s "inability to perform the [academic] tasks demanded of him was a frequent antecedent to his negative behaviors." (ALJ Decision, at 40).

Ultimately, the arguments above about J.R.'s behavior at High Road, his cognitive deficits, and his lack of academic progress all fold into a single inquiry as to whether the Ivymount behavioral approach is the only way to provide J.R. with a FAPE. Plaintiffs argue that the ALJ improperly weighed the testimony and evidence in front of her, but their arguments ultimately reduce to disagreements as to her result more than her procedure. The ALJ acknowledged the various opposing contentions made by the parties as to each of the issues Plaintiffs' now raise and considered all of the evidence. In according due weight to her administrative findings made in a

regular manner and having evidentiary support, there are no grounds to vacate or reverse that decision.

Plaintiffs advance one final argument in their supplemental briefing. They argue that *Endrew F.* mandates that a school district may not simply carry over "the same basic goals and objectives from one year to the next [as the student] fail[s] to make meaningful progress toward his aims." (ECF No. 34, at 13 (quoting *Endrew F.*, 137 S.Ct. at 996)). Because Defendants "copied exactly the behavioral goals from his January 2013 IEP into his April 2014 IEP and again into his August 2015 IEP," Plaintiffs contend that the 2015 IEP is necessarily ineffective under *Endrew F.* (ECF No. 34, at 13). As Defendants point out, Plaintiffs have never disputed the substance of the 2015 IEP goals, and the ALJ had no opportunity to make a ruling on them. (ECF No. 35, at 4). This dispute has focused solely on J.R.'s school placement, and Defendants' 2015 placement took a significantly different approach in 2015 than it had in previous years. Moreover, unlike the school district in *Endrew F.*, however, Defendants here had proposed a significant adjustment for J.R.'s 2015 year; his behavioral goals were the same, but all parties agreed that he should be sent to a new school in an entirely different academic program. This case is therefore entirely unlike *Endrew F.*, in which the student was being sent

to the same school with an entire IEP that was "pretty much the same as his past ones." *Endrew F.*, 137 S.Ct. at 996. Accordingly, this argument has no weight.

In sum, "there is nothing in the record suggesting that the hearing officer's process in resolving the case was anything other than ordinary." *J.P.*, 516 F.3d at 259. As the ALJ noted, Defendant's inability to diagnose J.R.'s disabilities correctly and the resulting lack of academic progress is quite concerning. But those past failures at different schools with different academic programs are insufficient to demonstrate that school district's planned placement at RTS was not reasonably calculated to provide an appropriate opportunity for educational progress in 2015-16.

## C. Predetermination

Plaintiffs also argue that the ALJ's holding that Defendants had not predetermined J.R.'s placement prior to the August 7, CIEP meeting should be overturned. Even if a school district provides a FAPE for a student, an ALJ may find a violation of the IDEA if procedural violations "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). School districts are therefore

prohibited from predetermining a student's placement prior to an IEP meeting. *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006); *Spielberg ex rel. Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256, 258-59 (4th Cir. 1988). However, "predetermination is not synonymous with preparation," *M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cty.*, No. RDB-09-3365, 2011 WL 2709196, at *9 (D.Md. July 11, 2011), and the members of the IEP team may, naturally, go into a meeting with some ideas or opinions.

> [I]f the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input. . . . [T]he holding of *Spielberg* required the school board to come to the table with an "open mind," but did not require them to come to the IEP table with a "blank mind." Thus, while a school system must not finalize its placement decision before an IEP meeting, it can and should have given some thought to that placement.

*Hanson ex rel. Hanson v. Smith*, 212 F.Supp.2d 474, 486 (D.Md. 2002) (citations omitted). This is all the more true in instances like this one, in which the IEP and CIEP teams had previously discussed the substance of J.R.'s IEP, but had postponed making further decisions until the parties involved could review the various school placement options.

At the hearing, the ALJ credited testimony from N.R. that Brenda Aswall, Defendants' Placement Specialist who had been

monitoring J.R.'s prior placement at High Road, called N.R. on the morning of August 7, 2015, and told her to be "ready for a fight" because Mr. Moore intended to send J.R. to RTS. (ALJ Decision, at 30). As the ALJ noted, it was "abundantly clear" that, prior to the August 7 CIEP meeting, Mr. Moore believed that RTS, as a public school, was preferable if it could serve J.R.'s needs. (*Id.* at 31).

Plaintiffs contend that prior to August 7, Ms. Aswall had consistently indicated to N.R. that the school district would agree to send J.R. to Ivymount, and that "a change clearly took place" between the conversation Ms. Aswall and N.R. had on August 6 and the call on the morning of August 7. (ECF No. 15-1, at 25). N.R. testified that it was clear that the decision had already been fully made because Ms. Aswall told her on the call prior to the meeting that she would "walk [N.R.] down the hall after the meeting to the due process office." (*Id.* at 26). They also emphasize that Mr. Moore had control of the CIEP meeting as the chair of the CIEP team. (*Id.* at 28). They point to testimony suggesting that Mr. Moore has an overbearing personality and that he influences the decisions of other school-based CIEP team members.

Plaintiffs read too much into Ms. Aswall's phone statements. In light of the conversations between N.R. and Ms.

Aswall indicating that "there would not be any problem approving [J.R.] for Ivymount," Ms. Aswall's warning call indicates only that she felt she "owe[d] it to [N.R.] to call" (ECF No. 15-1, at 25) because she had misled N.R. into thinking that Ivymount would be an easy, consensus selection up until August 6. Telling N.R. to come in "ready for a fight" suggests that Plaintiffs would have to persuade the other members of the team because Mr. Moore appeared to think that RTS was a better placement. The ALJ thus rightly considered the statements in the phone call to be only a statement of "Ms. Aswall's understanding of Mr. Moore's intentions" going into the meeting, which she found not to be dispositive in light of the other evidence, including his testimony that he had not previously shared his opinions with other members of the team. (ALJ Decision, at 30). As Defendants point out, the phone call should be viewed in light of Ms. Aswall's testimony that "no decision was made outside of the IEP team." (ECF No. 25-1, at 25-26).

Plaintiffs' arguments as to Mr. Moore's power and influence are undermined by other evidence in the record on which the ALJ relied. The ALJ found that "Mr. Moore was convinced, as early as June, that RTS was the appropriate program." (ALJ Decision, at 32). As she pointed out, however, Mr. Moore's opinion did

not prevent the CIEP team from considering both RTS and Ivymount at the CIEP meeting and having "a robust discussion" about the placement options. (*Id.* at 33). More importantly, the ALJ's ultimate decision as to predetermination was premised on the fact that "it was the majority of the team, not Mr. Moore [alone], who made the decision." (*Id.* at 34). She found "no evidence that he coerced or intimidated or, other than the conversation with Ms. Aswall, even discussed his opinion with the rest of the team before the meeting." (*Id.* at 34). Instead, the ALJ concluded that "the team . . . was persuaded by the presentation at the August 7, 2015 meeting that RTS could implement [J.R.'s] IEP," and "was not persuaded by the Parents' objections." (*Id.* at 35). Specifically, the ALJ noted that even Ms. Aswall supported the recommendation, and had done so based on what Ms. Lertora, not Mr. Moore, had said at the meeting. (*Id.* at 33).

The evidence presented in this case is a far cry from the cases Plaintiffs cite in which courts have previously found predetermination. In *Spielberg*, for example, the school board issued a "series of written letters" determining the student's placement before the IEP meeting was held. 853 F.2d at 258. In another case Plaintiffs cite, *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004), the school district had

32

an "unofficial policy" not to consider certain types of programs and had "refused to even discuss the possibility" of placing the student at such a school. Here, the evidence clearly shows that the CIEP team discussed both Ivymount and RTS. That the CIEP team members from the school were not ultimately persuaded by Plaintiffs' arguments does not mean that they were not open-minded. Accordingly, there is no indication that the ALJ's finding that the school district had not predetermined J.R.'s placement lacks evidentiary support or was not made in a regular manner.

**D.   Discovery Disputes**

Finally, Plaintiffs argue that the ALJ erred by failing to hold Defendants accountable for their discovery violations. In particular, Plaintiffs reference the following documents that were not provided until the middle of the hearing: (1) a January 2015 letter from Ms. Lertora to the staff of RTS in which she states that the school administration had both worked "to address ongoing safety issues" and implemented a "[t]emporary hold on placing additional students at Rock Terrace . . . until additional supports are in place" (P-139-1)[7]; (2) an Academic Action Plan subsequent to standardized testing showing that a majority of students scored worse on reading tests at the end of

_____

[7] The designation "P-###-##" refers to the exhibit number and page number of Plaintiffs' exhibits in the ALJ hearing.

the 2014-15 school year than they had at the beginning of the year and that a substantial number of students scored worse on math tests (P-142-15); (3) results from a survey indicating that communication could be improved between psychologists and classroom aides as to "ways to support student behaviors" (P-143-22); (4) data breaking down the number of behavioral incidents at RTS based on time, month, location, grade, incident type, and other factors (P-146); (5) staff responses from an exercise during the Summer 2013 Leadership Week in which behavioral data collection is noted by several responders on their lists of potential "growth areas" (P-147); and (6) Mr. Moore's notes from the August 7, 2015, CIEP team meeting (ECF No. 15-1, at 19). The ALJ found that Plaintiffs were able to address sufficiently all issues related to the RTS background documents after the documents were produced, and that Mr. Moore's notes did nothing more than "confirm Mr. Moore's testimony."

Plaintiffs focus primarily on the documents related to RTS. (ECF No. 15-1, at 20-21).[8] They emphasize that their expert

---

[8] Defendants blithely suggest that Plaintiffs "focused on the School Board's alleged failure to produce Mr. Moore's personal notes" in their motion for summary judgment and that they "switched their focus" after "consider[ing] the School Board's defense to that argument." (ECF No. 29, at 13). While Plaintiffs provided an excerpt showing the ALJ's determination that the school board had violated the discovery requests as to

witnesses, Dr. Solomon and Dr. Lestremau, were unable to use these documents in developing their evaluations and comparing RTS to Ivymount. (ECF No. 26, at 18-19). Plaintiffs contend that Dr. Lestremau was "forced to ignore the obvious value of comparing the Ivymount approach to that of Rock Terrace" and that Dr. Solomon testified that "the academic deficits of Rock Terrace identified in the discovery documents would have affected her opinion on the suitability of the school." (*Id.*). Not having these documents, Plaintiffs contend, impaired their ability "to tailor [their] case appropriately." (ECF No. 15-1, at 21).

The late-disclosed documents are far from revelatory. Most speak in broad strokes and several come in the context of internal feedback forms specifically asking respondents to brainstorm areas of potential improvement, which do not provide much insight as to current performance. The ALJ allowed Dr. Solomon to testify a second time to respond to these documents and found that Dr. Solomon's testimony after reviewing the documents was, "in essence, that the documents confirmed the opinions she had previously expressed." (ALJ Decision, at 45). Although Dr. Lestremau was not called later, there is no

---

Mr. Moore's notes (ECF No. 15-1, at 19), all of Plaintiffs' arguments as to the ALJ's errors focused on the documents related to RTS (*Id.* at 20-21).

indication that these documents would have led her to present testimony any different than what she had previously provided; the general RTS information in these documents would not easily be contrasted with her testimony, primarily a detailed technical description of the Ivymount teaching and behavioral approach. The ALJ found that the issues raised in the documents were not prejudicial to her decision, and nothing in the record provides a reason to disrupt the ALJ's determination.

## III. Request for Additional Evidence

Plaintiffs have also moved to supplement the record with evidence of J.R.'s success at Ivymount over the 2015-16 school year. (ECF No. 16). Federal law mandates that a court deciding an action brought under the IDEA "shall receive the records of the administrative proceedings; *shall hear additional evidence at the request of a party*; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C) (emphasis added). The Fourth Circuit has adopted a restrictive interpretation of what evidence will qualify for admission as "additional evidence" under this provision:

> A lax interpretation of "additional evidence" would "reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial *de*

> novo." *Roland M. v. Concord Sch. Comm.*, 910
> F.2d 983, 997 (1st Cir. 1990), *cert. denied*,
> 499 U.S. 912 (1991). Therefore the
> exclusion of "testimony from all who did, or
> could have, testified before the
> administrative hearing" would be "an
> appropriate limit in many cases."
> *Burlington* [*v. Dep't of Educ.*], 736 F.2d
> [773,] 790 [(1st Cir. 1984), *aff'd*, 471 U.S.
> 359 (1985)].

*Springer v. Fairfax Cty. Sch. Bd.*, 134 F.3d 659, 667 (4th Cir.

1998) (adopting generally the approach to "additional evidence"

set out in *Burlington*).

Evidence with which a party seeks to supplement the

administrative record must also be relevant. Because the

critical question in determining whether a school placement was

reasonably calculated to provide a FAPE is whether the student

would have derived educational benefits from the placement if it

had been implemented, *K.C. v. Bd. of Educ. for Montgomery Cty.*

*Pub. Sch.*, No. DKC 06-2928, 2007 WL 1521054, at *4 (D.Md. May

22, 2007), the Fourth Circuit has expressed skepticism about the

relevance of evidence that arises after the conclusion of an

administrative hearing, *see Schaffer ex rel. Schaffer v. Weast*,

554 F.3d 470, 476-78 (4th Cir. 2009). As the *Springer* court

noted, accepting additional evidence that arose after the ALJ

hearing "risks diminishing the role of administrative

proceedings" by asking district courts to overturn ALJ decisions

based on evidence that did not exist at the time the ALJ made

37

its decision, let alone when the school district's decision was made. *Id.* at 476. District courts are thus right to "treat[] such evidence cautiously." *Id.; see also A.S. v. Trumbull Bd. of Educ.*, 414 F.Supp.2d 152, 170–71 (D.Conn. 2006) (concluding that "any evidence regarding the [student]'s recent progress will have at best only a tangential bearing on the relevant question[,] . . . whether the Board offered Plaintiffs a free appropriate public education during the [relevant] school year."); *J.R. v. Bd. of Educ. of Rye Sch. Dist.*, 345 F.Supp.2d 386, 395 (S.D.N.Y. 2004) ("[W]e . . . must not engage in Monday-morning quarterbacking guided by our knowledge of [the student]'s subsequent progress at [a particular school], but rather [must] consider the propriety of the IEP with respect to the likelihood that it would benefit [the student] at the time it was devised.").

Another judge in this district denied a similar motion in *M.C.E. ex rel. T.Q.A. v. Board of Education of Frederick County*, No. RDB 09-3365, 2010 WL 2483440, at *3 (D.Md. June 15, 2010), where the parents argued that the evidence of the student's subsequent success at one school demonstrated that the school district's assessment of the student and their placing her at a different school were unreasonable. Relying on the principles above, the court rejected a motion to supplement the

administrative record on the ground that it would "undercut the ALJ's credibility determination and impermissibly transform the administrative review into a hearing *de novo.*" *Id.*

Plaintiffs have distinguished their motion from other requests for additional evidence by arguing that the new evidence shows not only that Ivymount is presently providing a FAPE, but also that the ALJ was wrong when she concluded "that [J.R.'s] cognitive limitations are the reason he had failed to make academic progress." (ECF No. 22, at 2). Plaintiffs assert that this determination as to J.R.'s cognitive abilities was "the linchpin of the ALJ's Decision denying reimbursement for [his] attendance at Ivymount for the 2015-16 school year." (*Id.*). They reference this sentence from the ALJ decision repeatedly in their motion for additional evidence; in fact, it is the only page they cite and language they quote at all.

Unsurprisingly, that single sentence does not capture the full breadth of the ALJ's decision. As described above, the ALJ did give consideration to test results that showed that J.R. was in the lower extreme levels of intelligence. (ALJ Decision, at 38). She also noted that none of the parties had questioned the validity of this test. (*Id.*). In fact, these test results appear to have been a significant factor in the 2014-15 IEP team's decision to transition J.R. from a diploma track to a

39

certificate track.  The ALJ thus attributed J.R.'s *past* failure to improve at High Road to its unreasonably high academic expectations, which in turn also led to behavioral issues.  (*Id.* at 38, 40).  She did not, however, indicate that *future* academic progress was impossible.  To the contrary, she seemed optimistic that moving J.R. from a diploma track program to a certificate track program would yield positive progress.  (*See id.* at 40-42).  Thus, it is far from clear that additional evidence of success at Ivymount would directly contradict any portion of the ALJ's opinion.

Even if it did, the ALJ's decision was "based principally on the failure of the Parents to demonstrate that RTS was not reasonably likely to provide a FAPE." (*Id.* at 43).  Put another way, she was "not persuaded that *only* the Ivymount approach will serve [J.R.'s] needs." (*Id.* at 40 (emphasis added)).  In making that determination, she considered testimony "that his behavior has improved, that he is happy at [Ivymount] and making academic progress." (*Id.* at 39).  As noted above, she ultimately found that J.R.'s "[s]uccess at Ivymount" was immaterial to the question of whether a hypothetical placement at RTS was reasonably calculated to provide a FAPE. (*Id.* at 43).  Given that the ALJ considered some evidence of J.R.'s success at Ivymount and found it immaterial to her decision, it is hard to

40

imagine how more of that same information could be material here. Even assuming *arguendo* that the new evidence proved conclusively that the intelligence testing evidence she accepted was incorrect, the new information would not undermine the decision as a whole, which was premised on whether RTS, not Ivymount, was an appropriate placement.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motions for summary judgment and for additional evidence will be denied, and Defendants' cross motion for summary judgment will be granted. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
